IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Tracy Reynolds Creekmore, | ) | Civil Action No.  5:14-3019-RMG-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| Carolyn W. Colvin, Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.).  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Income Benefits ("DIB"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.   Relevant Background

A.  Procedural History

On November 7, 2007, Plaintiff protectively filed an application for DIB alleging a disability onset date of July 15, 2007. Tr. 120-27, 216. Her application was denied initially and upon reconsideration. Tr. 74, 86. Plaintiff requested a hearing and on August 21, 2009, a hearing was held before Administrative Law Judge ("ALJ") Ivar E. Avots. Tr. 25-57. On September 4, 2009, ALJ Avots issued an unfavorable decision finding Plaintiff was not disabled. Tr. 16-24. After the Appeals Council denied her request for review, Tr. 1-6, Plaintiff appealed the unfavorable decision to the United States District Court for the District of South Carolina and obtained an Order, filed July 13, 2012, reversing the Commissioner's decision and remanding the

case for further proceedings, Tr. 1045-52. Based on the court's order, on July 18, 2012, the Appeals Council remanded the matter for further consideration. Tr. 1084-87. Plaintiff filed a subsequent application for DIB on July 19, 2010, alleging an onset date of September 15, 2007. Tr. 1104-05. The Appeals Council consolidated the two matters, Tr. 1086, and ALJ Avots conducted a second administrative hearing on August 15, 2012, Tr. 901-74. Plaintiff appeared and testified; Plaintiff's husband also testified at the hearing, along with an impartial medical expert and vocational expert. *Id.* On October 4, 2012, the ALJ issued an unfavorable decision denying Plaintiff's claim. Tr. 879-89. Plaintiff filed a request for review of the ALJ's decision on or about November 14, 2012, Tr. 865-75, which was denied by the Appeals Council on June 11, 2014, Tr. 838-841. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 29, 2014. ECF No. 1.

## B. Recent Administrative Proceedings

Plaintiff's second administrative hearing was held on August 15, 2012. Tr. 903. Plaintiff appeared with counsel, along with the following: Dr. Alfred G. Jonas, Medical Expert; Bryne Creekmore, Plaintiff's husband and lay witness; and Robert E. Brabham, Sr., Vocational Expert. Tr. 901. The ALJ elected to first take testimony from Dr. Jonas "because we are dealing with the period now in the past. We're dealing with the period of her alleged onset date . . . of July 15, 2007 through her date last insured of June 30, 2012 now." Tr. 905.

### 1. Medical Expert Testimony

Dr. Jonas testified that he was board certified in psychiatry and was responding to questions in the role of an impartial medical expert or advisor. Tr. 905. Dr. Jonas testified that he had not personally examined Plaintiff but he had reviewed all of the medical information. Tr. 906. Before offering his opinion, Dr. Jonas requested clarification on two issues. First, he noted

that Exhibit 5F, dated March 19, 2006, indicated an issue with seizure disorder and Plaintiff was instructed not to drive. Then, Exhibit 7F, dated April 27, 2006, indicated Plaintiff drove herself to the examination. Dr. Jonas inquired as to why Plaintiff continued to drive if she was advised not to drive. Tr. 906. Plaintiff responded that it was determined the only reason she had the seizure was because she had gone off her Ativan medication. Tr. 907. Dr. Jonas's next issue related to Exhibit 49F, dated March 22, 2011, which discussed the possibility of shock treatment for Plaintiff's persistent complaints of depression but Plaintiff did not want the treatment. Dr. Jonas inquired as to why "in view of the complaint of depression and what appears to have been a lack of adequate success from other intervention why she didn't want shock treatment." *Id.* Plaintiff testified that she was "scared of it." *Id.*

The ALJ asked Dr. Jonas to testify as to Plaintiff's "most significant" problems. Tr. 908. Dr. Jonas confirmed that Plaintiff's problems were all mental, and outlined diagnoses obtained before Plaintiff's alleged onset date that included anxiety, personality disorder or personality traits of a histrionic quality, depression, substance abuse, and attention deficit disorder. *Id.* Dr. Jonas also noted that for a short time after Plaintiff's alleged onset date there was persistent substance abuse—mainly alcohol but there was also reference to methamphetamine and marijuana. Tr. 908-09. Dr. Jonas noted that after a two-or-three day detox hospitalization in September 2007, there was no more substance abuse. Tr. 909. Based on his review of the record Dr. Jonas determined that after 2007 Plaintiff had a "mix of considerations, which would mostly center on depression and anxiety, which is to say [Listing] 12.04(1) and 12.06." *Id.* Dr. Jonas noted one diagnosis for bipolar disorder but found no support for that diagnosis. *Id.* Dr. Jonas considered the A criteria of the Listings to be determinable, but found under the B criteria "things [got] a little bit more ambiguous and a little bit more murky." *Id.* Dr. Jonas noted

3

inconsistencies in certain reports of Dr. Khan and Dr. Bruce where they rated Plaintiff "poor" in almost all categories in her ability to do work-related activities, but still concluded she was capable of independent management of finances. Tr. 910-11. Dr. Jonas also noted inconsistencies in reports of adaptive functioning and Plaintiff's mental state and "felt that there was not enough reasonable, consistent and reliable support for these kinds of dire B Criteria conclusions and estimations. So [he] did not conclude that she was really that functionally impaired." Tr. 911. Dr. Jonas stated he did not have enough information for the period at issue to rate Plaintiff's activities of daily living ("ADLs"); however, for social functioning the impairment would be at moderate-to-marked level and for concentration, persistence and pace his sense was the impairment was in the mild-to-moderate range. Tr. 911-12. Dr. Jonas concluded that Plaintiff did not meet or equal Listing 12.04(1) or 12. 06 and he thought "the record is a little bit inconsistent and ambiguous." Tr. 912.

The ALJ asked Dr. Jonas to consider an assessment by Dr. Khan noting that Plaintiff experienced three episodes of decompensation each of extended duration and asked if there was any evidence in the record to support that finding. Tr. 913 (citing to Exhibit 54F, pg. 14 at Tr. 1369). Dr. Jonas responded "there are no episodes of decompensation at all after that September of '07 hospitalization." *Id.* The ALJ also inquired regarding Dr. Khan's diagnosis in that same exhibit of a GAF score of 55. Tr. 914. Dr. Jonas responded that he did not believe in the application of GAF, but if he did, someone as "functionally impaired as Dr. Khan generally says really could not have a GAF estimated in the mid-50s." *Id.* Dr. Jonas stated that nothing in Dr. Hossain's subsequent treating notes would change his opinion. *Id.*  The ALJ asked Dr. Jonas to discuss the consultative opinion at 50F.[1] Tr. 916. Dr. Jonas opined the examination revealed

---

[1] Exhibit 50F is a Mental Status Exam completed by Robin L. Moody, Ph.D., LPC dated August 23, 2011. Tr. 1325-27.

"something of a concentration impairment" that would be in the mild-to-moderate range. Tr. 917. The ALJ asked Dr. Jonas if he saw any evidence of continuing alcohol problems after 2007, and he responded in the negative. *Id.*

Plaintiff's counsel questioned Dr. Jonas on his background. Tr. 918. Dr. Jonas testified that he has been in practice since he completed his formal training and fellowship in 1983, and has a general psychiatry practice in Miami, Florida treating "everyone except young children." *Id.* Dr. Jonas stated he does not do any hospital work, only outpatient treatment. *Id.* Dr. Jonas confirmed that he reviewed all the medical records and found "potentially adequate support" for the diagnoses of depression and anxiety but no support for the diagnosis of bipolar disorder. Tr. 919. Counsel questioned whether Plaintiff's inpatient stay at Carolina Center for Behavioral Health in 2005 could be considered a type of mania. Tr. 920. Dr. Jonas stated the hospitalization appeared to be "about substance abuse and the problems caused by the substance abuse, which looked in part like psychosis and in part like behavioral problems and maybe in part like some depressiveness." Tr. 921. Dr. Jonas agreed that in some cases substance abuse can be symptomatic of bipolar. *Id.* Dr. Jonas reiterated that there was no support in the record for a diagnosis of bipolar disorder for Plaintiff. Tr. 923.

Plaintiff's counsel asked if Dr. Jonas saw any internal inconsistencies in Dr. Khan's statements in Exhibit 31F, and Dr. Jonas replied that he did not. Tr. 925. Counsel asked Dr. Jonas, assuming he had treated a patient for six years and tried multiple medications, if he thought he would be the "best expert to provide an opinion regarding [his] patient and his or her ability to work." *Id.* Dr. Jonas responded in the affirmative. *Id.* Counsel then asked Dr. Jonas to agree that he was giving an opinion based on the written record without actually speaking to Plaintiff's treating physicians, and Dr. Jonas agreed. Tr. 926. Counsel then commented that

treating physicians would have more knowledge and information than what "was physically stated in the records." *Id.* Dr. Jonas stated that that was a "tricky assumption to make" and opined as follows:

> [A] doctor who treats a patient face-to-face, gets to see them over a period of a long time can ask them any questions they want, has a certain kind of advantage over a doctor who has never laid eyes on the patient, never really asked them anything and only reviews records. On the other hand, the record reviewing doctor, who gets to see the patient usually over a longer period of time than the treating doctor and gets to compare various other people's views of the same person has a different kind of advantage. So each, each doctor or each physician has a kind of advantage over the other. I don't know that I would convert that into here's the one who knows and the other one doesn't know.

Tr. 926. Counsel asked Dr. Jonas to comment on Plaintiff's "failing numerous medication trials." *Id.* Dr. Jonas testified that there could be two explanations, the first would be a wrong diagnosis and the second would be that the patient "who somehow doesn't respond to very many treatments, and you have to keep trying different ones, and there certainly are certain treatments that are much more effective than others, and sometimes you have to resort to them." Tr. 927. Dr. Jonas stated that if he saw "somebody who has taken various different medications and different classes of the same general type of medication and never gotten better, [he would] always question the diagnosis." *Id.*

Plaintiff's counsel asked Dr. Jonas if a person could be stable on a medication regimen and still be unable to work. Tr. 929. Dr. Jonas responded affirmatively but stated it was most common in an individual with schizophrenia, but there was no reason that a person treated for depression should not "get back to full functioning." *Id.* Counsel asked if Dr. Jonas had an opinion on Plaintiff's ability to work and Dr. Jonas testified as follows:

> I think based on the record as I have seen it there would be some functional limitations for her, and I don't know that I would say to you that adding up those functional limitations we would get a conclusion which is that she's not capable of working. But I do think that she would have significant limitations in terms of

social functioning. So that would mean that there would be some kinds of jobs that I believe she could not do. And it may very well be that there are certain kinds of settings that would include . . . maybe cognitive or intellectual application or more intensive levels of persistence that she might now be capable of doing. And I think you'll have to put that together with whatever your VE [Vocational Expert] can tell you in order to conclude whether we're talking about somebody who can't work. I don't think I can really give you a conclusion like that.

Tr. 932.

### 2. Plaintiff's Testimony

Plaintiff testified that she lived in a house with her then-45-year-old husband. Tr. 933. Plaintiff testified that she had a high school education and last worked in July 2007 for Michael Hall, the owner of Carolina Central Vacuum. Tr. 934. Plaintiff testified that Mr. Hall hired her as a favor to her father after she was declined initially for disability benefits. Tr. 934-35. Plaintiff testified that her job duties consisted of riding with Mr. Hall to various houses that needed vacuum systems installed, carrying his tools, and holding the measuring tape as he measured walls. Tr. 935. The tools were handheld and included measuring tools, hammers, a toolbox, and sometimes pieces of PVC pipe. *Id.* Plaintiff stated that later, when Mr. Hall tried to have her answer the phone or give out directions to his workers, "it got just a little too much." *Id.* Plaintiff stated the job ended when she was depressed and could not go to work and Mr. Hall "let [her] go." Tr. 936.

Plaintiff testified that she had been on medication for her mental impairments since 1994 or 1995. Tr. 936. Plaintiff stated that she had gastric bypass surgery on September 11, 2001, because she was morbidly obese. Tr. 936-37. She stated that after the surgery she had a "so-called nervous breakdown and . . . started going downhill." Tr. 937. Plaintiff testified that at the time she was working for Hitachi and had been there for nine years. *Id.* That job ended in 2002 when the company closed and although it affected her very badly because she had to work she

found another job. *Id.* She then worked as a receptionist for Cardiovascular Associates but that job ended because she "cried all the time, and so [she] thought if [she] try [sic] another place, different atmosphere, a change, that it would get better. So [she] put in [her] notice and found another job." *Id.* Plaintiff testified that she worked for another cardiologist as a receptionist but was terminated because she thought the other workers "had it in" for her and she "started making mistakes and started not wanting to go in the mornings, not wanting to stay, made mistakes." Tr. 938. After she was terminated she filed for disability. *Id.* After she was denied for disability she worked at Carolina Central Vacuum. *Id.* Plaintiff testified that being fired from her last job at Carolina Cardiology led to her inpatient stay at Carolina Center for Behavioral Health.[2] *Id.* She stated that after she was fired she "just went crazy" and began behaving recklessly. Tr. 938-39. After she got out of Carolina Center for Behavioral Health she began seeing Dr. Kahn. Tr. 939.

Plaintiff testified that her two-day hospitalization at Wells Spring in 2007 was because she realized she had a drinking problem. Tr. 939. Plaintiff stated she checked herself out early because it upset her husband that she went in and she thought she needed to get back home and just get treatment from Dr. Kahn. Tr. 939-40. Plaintiff testified she had been seeing Dr. Kahn consistently since that time and was compliant on her medication. Tr. 940. Plaintiff stated that within the year she switched to Dr. Hossain because Dr. Kahn moved out of state, and she was seeing Dr. Hossain consistently and was compliant with her prescribed medication. *Id.* Plaintiff indicated Dr. Hossain was continuing to change her medication. *Id.*

Plaintiff testified that she is unable to work because she cannot concentrate for a long period of time. Tr. 940. She stated that she wakes up most mornings with "sheer panic" that sometimes lasts all day and she cries all the time. Tr. 941. Plaintiff testified that she has crying

---

[2] Medical records indicate Plaintiff was admitted to Carolina Center for Behavioral Health on September 26, 2005. *See* exs. 22F - 25F, Tr. 547-661.

spells several days a week. *Id.* She stated that she is unable to deal with stress. *Id.* Plaintiff recounted an incident where she found two kittens but unable to care for them and gave them away because "it tore [her] nerves up because [she] didn't know what to do." *Id.* Plaintiff testified that she is unable to deal with a change in routine and that she is unable to watch new television episodes because she "can't concentrate on them long enough to know what the plot is." Tr. 942. Plaintiff stated she sleeps 12-to-14 hours a day, and she has some OCD [obsessive compulsive disorder] symptoms. Tr. 942-43. Plaintiff testified she is unable to make decisions and her husband makes all decisions for her. Tr. 943. Plaintiff stated that her medications "help for awhile" but then it seems as if she "get[s] immune to them or something and it all comes back." *Id.* Plaintiff stated that medical notes indicating that she is doing better means that she did not cry in the last couple of days or did not have thoughts of suicide. *Id.*

In response to Dr. Jonas's testimony questioning her bipolar diagnosis Plaintiff stated that if she stopped taking her medication she would go back into a manic phase and "would start being reckless." Tr. 944. Plaintiff stated she "would probably try to self-medicate" with alcohol or drugs. *Id.* Plaintiff confirmed that mental impairments are causing her disability but she stated she does have torn cartilage in both knees that causes her daily pain. Tr. 945. Her primary physician, Dr. Bruce, prescribes her Ultram for pain. *Id.* She also has pain in her left ankle stemming from a car accident in which she broke her foot and arthritis has formed in her ankle. Tr. 946. Plaintiff also stated that her "body aches from just laying around so much." *Id.* Plaintiff testified that she spends most of the day on the couch watching TV. *Id.* Plaintiff stated she does not go shopping, but she attends church some Sunday mornings with her parents. Tr. 947. Plaintiff stated that her husband helps her manage her medications. Tr. 948. She stated that she used to drive "some" but because of recent "thoughts [she] was having of driving into transfer

trucks" she stopped driving. *Id.* Other than church, her parents, and occasional visits from girlfriends, Plaintiff stated she does not socialize. Tr. 949. Plaintiff testified she is able to do some chores including cooking three or four times a week, laundry once a week, and, if it is "not a panic day," she can vacuum. *Id.* Plaintiff stated she does not do yard work but helps to care for her two dogs. Tr. 949-50.

In response to questions from the ALJ Plaintiff testified that she worked for Carolina Central Vacuum for "about 10 months" but could not "say that for sure." Tr. 950. Plaintiff confirmed that she was not working, was unable to do any outdoor activities, and had no hobbies. Tr. 950-51. Plaintiff testified she went to the beach with her parents for six days in June 2012. Tr. 951. Plaintiff stated she does not read, listen to music, text on her cell phone, or use the computer. Tr. 951-52. Plaintiff testified she does not have any side effects from her current medications and does not use any assistive devices for her knee or ankle impairments but will use a heating pad or icepack for relief. Tr. 952. Plaintiff stated that she worked as a secretary at Hitachi. Tr. 953. She stated she has not had alcohol since 2007, and last went on a cruise to the Bahamas in 2007. Tr. 953-54. In response to follow-up questions from her counsel Plaintiff testified that on her recent beach trip she "just stayed in the camper" and watched DVDs on TV. Tr. 954.

### 3.  Lay Witness Testimony

Plaintiff's husband of 18 years, Bryne Robert Creekmore, testified. Tr. 955. He testified that he has worked for a company in Simpsonville for 18 years, works third shift, is at home during the day, and has the opportunity to observe Plaintiff during her waking hours. Tr. 956. Mr. Creekmore testified that after Plaintiff's gastric bypass surgery in 2001 and after losing her job at Hitachi she "basically just got into mood swings, got really depressed, anxiety problems.

Just very, very difficult time of trying to make decisions, things like that." *Id.* Mr. Creekmore stated that during the day Plaintiff does very little—"[m]ostly sleeping and watching TV, very inactive." Tr. 957. He testified that she does not help much around the house and does not stay on task when she starts something. *Id.* He indicated Plaintiff has some memory problems and he has to make lists for her. *Id.* Mr. Creekmore testified that he keeps Plaintiff's medication container up-to-date daily and confirmed that her medications have "been changed several times." Tr. 958.  Mr. Creekmore stated that Plaintiff often has crying spells that are triggered "if any kind of pressure is put on her." *Id.* He testified that he "pretty much" makes all the decisions for their household. Tr. 959. Mr. Creekmore stated that Plaintiff's panic attacks are triggered when it is "time to make a decision needing to go to a public place" and she sometimes wakes up in a panic. *Id.* Mr. Creekmore testified that Plaintiff is compliant with her medications and they help for a while but then she has to get them changed. Tr. 960. Mr. Creekmore stated that he had suggested electric shock therapy but Plaintiff "couldn't make the decision to do it . . . she didn't think it was necessary and it would work." Tr. 960-61. Mr. Creekmore testified that he does all of the shopping, because in the past he would get phone calls that she was in the grocery store in a panic and he "would have to go and rescue the situation." Tr. 961. He stated Plaintiff does not socialize outside of their parents. *Id.* Mr. Creekmore testified that he did not believe Plaintiff could work because of her mental state. Tr. 962.

In response to questions from the ALJ Mr. Creekmore stated that he and Plaintiff had driven to Florida with her parents to visit Mr. Creekmore's father. Tr. 963. He also testified that Plaintiff had last driven a few days prior to the hearing to visit her parents. *Id.* In response to questions from Plaintiff's attorney Mr. Creekmore stated that the last time they rode on his motorcycle Plaintiff stated that "she wanted to jump off as [they] were riding along." Tr. 964.

Mr. Creekmore felt that statement indicated she meant to kill herself. *Id.* In response to the ALJ, Mr. Creekmore stated that Plaintiff rode with him on his motorcycle "a couple of times a year." Tr. 965.

### 4. Vocational Expert Testimony

VE Robert E. Brabham, Sr. testified at the administrative hearing. Tr. 966. The VE first noted some inconsistency between Plaintiff's description of her job with Central Vacuum and the state agency description of it as mechanic maintenance helper. Tr. 967. The VE opined that the job was more clerical as performed by Plaintiff. *Id.* The VE described Plaintiff's past work as receptionist, DOT number 237.367-038, semi-skilled, SVP:4, sedentary; and general office clerical, DOT number 219.362-010, semi-skilled, SVP:4, light. Tr. 968-69. The VE opined that dealing with reports, office equipment, and office records would be skills transferable to similar settings. Tr. 969.

For his first hypothetical the ALJ asked the VE to assume an individual 40-to-45 years old, with a high school education, and work history as documented and testified to with the following limitations:

> There would be no exertional limitations, but there would be some postural ones. This individual should never climb a ladder, rope or scaffold, but could frequently perform all other postural activities. There would be some additional environmental limitation. She should avoid even moderate exposure to hazards such as unprotected heights and dangerous machinery. And based on 8F in the longitudinal record[3] she would have some mental limitations, but in spite of these she could concentrate, persist and work at pace to do simple, routine, repetitive tasks at one and two-step instructions for extended periods, say two-hour periods in an eight-hour day. She could interact frequently with the public and interact appropriately with co-workers and supervisors in this type of stable routine setting.

---

[3] Exhibit 8F is a Mental RFC Assessment completed by Medical Consultant Craig Horn dated May 10, 2006. Tr. 411-13.

Tr. 969-70. The VE agreed with the ALJ that based on mental demands, the individual would be unable to do Plaintiff's past work. Tr. 970. The VE indicated that other work would be available in the categories of assembler/fabricator, packager, and hand packers. Tr. 970-71. The VE noted there would be work available in significant numbers at all exertional levels. Tr. 971.

The ALJ further modified the hypothetical based on Exhibits 46F and 52F,[4] to add exertional limitations as follows:

> [T]his individual could lift, carry, push, pull, 50 pounds occasionally, 25 pounds frequently, sit, stand or walk about six . . . hours each out of an eight-hour day. Again, this individual should never climb a ladder, rope or scaffold. Frequently perform all other postural activities. Again avoid even moderate exposure to hazards. And based on 45F and 53F[5] there would be some additional mental limitations, bus she could still concentrate, persist and work at pace to do simple, routine tasks, one and two-step procedures for two-hour periods, extended periods, say two-hour periods in an eight-hour day. At this time, she'd be limited to only occasional interaction with the public, but she could interact appropriately with co-workers and supervisors in this type of stable routine setting.

Tr. 971-72. The VE noted that the jobs he described previously had no public interaction and that based on the amended hypothetical the jobs would be available. Tr. 972. The ALJ further amended the hypothetical based on Exhibit 31F[6] to find the individual could not "concentrate, persist and work at pace for two-hour periods to do simple, routine, repetitive tasks in an eight-hour day . . . ." *Id.* The ALJ asked if there would be any work for such and individual in the regional and national economy, and the VE responded in the negative. *Id.*

---

[4] Exhibit 46F is a Physical RFC Assessment completed by Medical Consultant Matthew Fox on January 14, 2011, Tr. 1292-99; Exhibit 52F is a Physical RFC Assessment completed by Medical Consultant Richard Whitney, M.D. on August 25, 2011, Tr. 1344-51.

[5] Exhibit 45F is a Mental RFC Assessment completed by Medical Consultant Robbie Ronin on December 21, 2010, Tr. 1288-90, and Exhibit 53F is a Mental RFC Assessment completed by Medical Consultant Robert Estock, M.D. on August 25, 2011, Tr. 1352-54.

[6] Exhibit 31F consists of a Mental Assessment of Ability to do Work-Related Activity dated April 15, 2009, and a Medical Assessment of Ability to do Work-Related Activities (Mental) dated January 3, 2008, both completed by Khizar Khan, M.D. Tr. 784-89.

Plaintiff's counsel asked the VE to assume a hypothetical individual with the mental limitations from Exhibit 54F:[7]

> Would rarely have the ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention, concentration, carry out complex job instructions, carry out detailed job instructions, relate predictably in social situations or demonstrate reliability.

Tr. 973. Counsel asked if any work would be available for such an individual and the VE responded that if all those limitations were accepted the individual would be unable to perform unskilled jobs. *Id.* Plaintiff's counsel asked the VE, based on the limitation provided by Dr. Bruce, to "assume a hypothetical individual that has poor or no[ ] ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention, concentration, carry out complex job instructions, carry out detailed job instructions, behave in an emotionally stable manner or relate predictably in social situations . . . ." Tr. 974. Counsel asked if any work would be available for such an individual and the VE responded, "No, sir, not in my experience." *Id.*

## II. Discussion

### A. The ALJ's Findings

In his October 4, 2012, decision the ALJ made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2012.

---

[7] Exhibit 54F consists of a Medical Source Statement (Mental) and a Psychiatric Review Technique form, Transfer Summary, and Progress Note all completed by Dr. Khan and dated March 20, 2012, and five additional Progress Notes completed by Dr. Khan dated August 29, 2011, September 28, 2011, November 21, 2011, December 27, 2011, and January 25, 2012. Tr. 1356-79.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 15, 2007 through her date last insured of June 30, 2012 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe combination of impairments: old left ankle injury with residuals, anxiety, depression, and history of alcohol abuse (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a range of medium work (lift/carry, push/pull 50 pounds occasionally, 25 pounds frequently, sit, stand and walk about 6 hours each in an 8-hour day) but with the following nonexertional limitations: never climb ropes, ladders, scaffolds, perform all other postural activities frequently, and avoid even moderate exposure to hazards such as unprotected heights and dangerous machinery. She can concentrate, persist ad work at pace to do simple, routine repetitive tasks at 1-2 step instructions for 2-hour periods in an 8-hour day, interact occasionally with the public, and interact appropriately with co-workers and supervisors in a stable routine setting.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on February 13, 1967 and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  The claimant has no transferable skills from past relevant work (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant retains the ability to perform work existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from July 15, 2007, the alleged onset date, through June 30, 2012, the date last insured (20 CFR 404.1520(g)).

Tr. 881-89.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[8] (4) whether such impairment prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs

---

[8] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. at 146, n.5 (regarding burdens of proof).

## 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of

that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.   Analysis

Plaintiff argues that the ALJ erred in the following ways:  (1) by failing to provide appropriate reasons for rejecting the opinions of her three treating physicians; (2) by failing to find her bipolar disorder, depression, and anxiety met the requirements for Listings 12.04 and 12.06; (3) by improperly discounting Plaintiff's credibility; (4) by failing the provide reasons for rejecting the lay testimony of Plaintiff's husband; and (5) by disregarding the VE's testimony.

Pl.'s Br. 1-2, 22. Plaintiff also asserts her case should be remanded for consideration of new evidence submitted to the Appeals Council. *Id.* at 2. The Commissioner counters that the ALJ's decision is supported by substantial evidence and "while Plaintiff had functional limitations, she did not establish disability under the Social Security Act." Def.'s Br. 1, ECF No. 18.

The undersigned will consider first Plaintiff's allegation regarding the Appeals Council's failure to consider new evidence as this issue may affect Plaintiff's other claims of errors made by the ALJ.

1.  Additional Evidence Submitted to the Appeals Council

Plaintiff alleges that the Appeals Council failed to consider "new and material" evidence submitted on November 19, 2012, that included "Dr. Khan's newly submitted Responses to Interrogatories, offer[ing] an opinion in reply to the testimony of medical expert, Dr. Alfred Jonas, upon which the ALJ relied heavily." Pl.'s Br. 23-24. Plaintiff notes that although the Appeals Council action outlined the exceptions contained in counsel's November 9, 2012 correspondence, it does not indicate that it received counsel's November 19, 2012 correspondence. *Id.* at 24. Additionally, Plaintiff notes that the transcript of record filed by the Commissioner did not include the November 19 letter or the attached responses by Dr. Khan. *Id.* Plaintiff argues that because there is no indication in the record that the Appeals Council considered the evidence this matter must be remanded pursuant to sentence four of 42 U.S.C. § 405(g). *Id.* at 27. Plaintiff also asserts, in the alternative, that if the Appeals Council did not receive the evidence submitted by counsel this matter should be remanded pursuant to sentence six of 42 U.S.C. § 405(g). *Id.* at 27-28. The Commissioner argues that "it is the ALJ's decision, not the Appeals Council's denial of a request for review, that is subject to judicial review under § 405(g)." Def.'s Br. 27. The Commissioner further argues that the Appeals Council was not

obligated to explain why it rejected Dr. Khan's form and even if it was required to do so "any such error would be harmless because Plaintiff has failed to establish that this one-page interrogatory satisfies the requirements for new and material evidence." *Id.*

 "The administrative scheme for handling Social Security claims permits the claimant to offer evidence in support of the claim initially to the ALJ. Once the ALJ renders a decision, the claimant is permitted to submit new and material evidence to the Appeals Council as part of the process for requesting review of an adverse ALJ decision. This new evidence is then made part of the record." *Wilson-Coleman v. Colvin*, No. 1:11CV726, 2013 WL 6018780, at *5 (M.D.N.C. Nov. 12, 2013) (citing 20 C.F.R. §§ 404.968, 404.970(b)).

Plaintiff attached to her brief a questionnaire completed by Dr. Khizar Khan dated November 15, 2012, which was six weeks after the ALJ's decision. Pl.'s Br. Ex. A, ECF No. 16-1 at 5. In that questionnaire Dr. Khan provided his opinion as to Plaintiff's diagnoses and limitations that contradicted the opinion of the medical expert who testified at Plaintiff's administrative hearing. *Id.*[9] The parties disagree as to whether Dr. Khan's questionnaire is new and material evidence. However, it is up to the Appeals Council to determine "if the submission constitutes 'new and material' evidence that 'relates to the period on or before the date of the [ALJ's] hearing decision.'" *Meyer v. Astrue*, 662 F.3d 700, 704-05 (4th Cir. 2011) (quoting 20 C.F.R. § 404.970(b)). "Confronted with such new and material evidence, the Appeals Council then 'evaluate[s] the entire record including the new and material evidence.'" *Id.*

The additional evidence at issue includes an opinion of a treating physician that has not been addressed by a fact-finder. The Fourth Circuit has noted that a lack

---

[9] Because the opinion is not included in the certified administrative record, the undersigned cannot consider it. *See Wise v. Colvin*, No. CIV.A. 6:13-2712-RMG, 2014 WL 7369514, at *16 (D.S.C. Dec. 29, 2014) (citing 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.")).

of additional fact finding regarding new evidence "does not render judicial review 'impossible'—as long as the record provides 'an adequate explanation of the Commissioner's decision.'" *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) (internal brackets omitted)). However, where new evidence competes with the evidence underlying an ALJ's decision, a situation arises in which "no fact finder has made any finding as to the [new evidence] or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Meyer*, 662 F.3d at 707. Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the Court "must remand the case for further fact finding" in such an instance. *Id.*

In the present case, because it is unclear whether the Appeals Council considered or rejected the additional evidence in accordance with the applicable regulatory provisions, and because the additional evidence involves a competing or conflicting opinion by a treating physician that may require reconciliation by a fact-finder, the Court concludes that this matter requires remand under sentence four of 42 U.S.C. § 405(g).

*Parker v. Colvin*, No. 1:11CV746, 2014 WL 4386291, at *3-4 (M.D.N.C. Sept. 4, 2014) (noting that because the plaintiff contended the evidence was actually submitted to the Appeals Council the case did not involve new evidence submitted for the first time to court under sentence six of 42 U.S.C. § 405(g)).

In this case, nothing in the record indicates the Appeals Council received or considered the additional evidence. Therefore, the undersigned cannot consider this as harmless error and the matter should be remanded for further fact-finding.

## 2.   Medical Opinions

Plaintiff argues the ALJ rejected the opinions of Dr. Khan, rejected the affirming opinion of Dr. Hossain, and rejected the opinion of Dr. Bruce. Pl.'s Br. 11. Plaintiff asserts the ALJ "committed reversible error by assigning little to no weight to the opinions of all three of Claimant's treating physicians. And, the ALJ made no comment as to the internal consistency between the opinions of all three treating physicians." *Id.* Plaintiff asserts that instead of giving credence to the opinions of Plaintiff's treating physicians "all of whom agree on the diagnosis of

Claimant's severe and disabling mental impairments the ALJ adopted the findings of the ME, Dr. Jonas, and Dr. Estock at Exhibit 51F, neither of whom evaluated Claimant." Pl.'s Br. 12.  As an example of how the ALJ erred in his residual functional capacity ("RFC") assessment Plaintiff further argues "the ALJ failed to address [in his RFC analysis] Claimant's inability to handle the normal stresses of work activity." *Id.* at 13. The Commissioner contends that the ALJ articulated appropriate reasons to support his evaluation of Dr. Khan's opinions. The Commissioner first argues that the issue of whether a claimant is disabled is an administrative finding "reserved exclusively for the ALJ, not a treating physician." Def.'s Br. 11. The Commissioner's second point is that "[a]s the ALJ correctly observed, Dr. Khan's opinions were not accompanied by objective clinical findings to support the extreme limitations assessed." *Id.* at 12 (citations to record omitted). The Commissioner's third argument is that Dr. Khan "appeared to base his opinion on Plaintiff's reports rather than objective clinical findings." *Id.* The Commissioner also argued that the ALJ explained that Dr. Khan's opinions were inconsistent with his own treatment notes, and the ALJ also discussed other evidence of record that contradicted Dr. Khan's assessments including records related to periods of decompensation and the opinions of Dr. Moody and multiple state agency physicians. *Id.* at 13, 15. In response to Plaintiff's allegation regarding the ALJ's RFC assessment, the Commissioner asserts the ALJ considered Plaintiff's inability to handle stress by "expressly limit[ing] Plaintiff to simple, routine, repetitive unskilled work in a stable routine setting." *Id.* at 15-16.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not

inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2). "Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527. The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)).

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Social Security Regulation 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

a.  Plaintiff's Treating Physicians

Plaintiff presented to psychiatrist Khizar Khan, M.D. on April 5, 2006 "as a self referral for ongoing management and treatment of 'Bipolar Disorder and Anxiety Disorder.'" Tr. 424.

Dr. Khan treated Plaintiff until March 20, 2012. *See* Transfer Summary, Tr. 1373. Upon Plaintiff's transfer from Dr. Khan, Dr. Kashfia Hossain began treating Plaintiff on May 10, 2012. Tr. 1382. Dr. Jackson Bruce of Piedmont Family Practice treated Plaintiff since 2006 for her physical ailments such as bronchitis and sinusitis. Tr. 771-83.

The district court remanded this matter to the Commissioner to consider treatment notes of Dr. Khan from January through July 2010, a mental health assessment of Dr. Khan dated March 8, 2010, and a mental health assessment of Dr. Bruce dated July 30, 2010. Remand Order, Tr. 1045-52. This medical evidence was submitted to the Appeals Council subsequent to the ALJ's first decision dated September 4, 2009. Tr. 1-6, 16-24.

b. ALJ's Consideration of Treating Physicians' Opinions

In addition to considering the new evidence in making his RFC assessment, the ALJ also referenced prior treatment notes of Dr. Khan including mental health assessment forms completed in January 2008 and April 2009, Ex. 31F, and an opinion in April 2008, Ex. 19F. The ALJ gave "little weight" to the opinion in Exhibit 31F in which Dr. Khan found that Plaintiff's "attention and communication was poor; dealing with the public was poor to limited, relating to co-workers poor, dealing with the public poor, interacting with supervisors poor, dealing with work stresses poor, understanding, remembering and carrying out complex instructions poor, detailed instructions poor, making personal-social adjustments poor in relating predictably in social situations, poor in ability to demonstrate reliability (31F)." Tr. 885. The ALJ gave "significant weight" to Dr. Khan's April 14, 2008 opinion in which Dr. Khan "noted the [Plaintiff's] thought and content process was intact, mood and affect worried and anxious, but attention, concentration, and memory adequate. Her ability to follow simple instructions, interact appropriately with others was fair (19F)." *Id.* The ALJ stated that he gave greater weight to the

opinion in Exhibit 19F "because this opinion is prior to his opinion in 31F, which appears to be a check-box type form prepared for litigation purposes later without significant accompanying clinical findings of severity." *Id.* On its face, this finding by the ALJ appears to be in keeping with requirements for evaluating opinion evidence. However, Exhibit 19F is also a checkbox form created by Disability Determination Services with no accompanying clinical findings. Furthermore, while the ALJ gives significant weight to some of the information, he does not address the finding made by Dr. Khan in Exhibit 19F that Plaintiff's ability to handle stress is "insufficient." Tr. 528.

The ALJ noted that despite rating Plaintiff as poor in 2008 and 2009, in both those and subsequent reports Dr. Khan opined that Plaintiff was capable of handling her finances. Tr. 885. The ALJ also noted that it appeared Dr. Khan's opinions in Exhibit 31F were based on Plaintiff's subjective complaints rather than objective findings. *Id.*  As instructed by the district judge in his Remand Order the ALJ considered Dr. Khan's opinions and treatment notes from 2010, and he also considered his opinions and treatment notes from 2011 and 2012. Tr. 885 (citing exs. 40F, 41F, 54F). The ALJ noted that Dr. Khan indicated Plaintiff had three periods of decompensation but that there was no support in the record for that observation. *Id.* He also noted Dr. Khan's advice to Plaintiff that she get some hobbies and engage in some structured work on a voluntary basis. *Id.* The ALJ concludes this discussion of Dr. Khan's opinions by stating that he gave "little to no weight to such unsupported, bald, subjective check-boxes and similar forms done solely for obtaining benefits." *Id.*

As for the opinion of Dr. Hossain, because the ALJ found that Dr. Hossain's opinions were "reasonably consistent" with Dr. Khan's opinions, he gave them little weight. Tr. 885. The ALJ considered Dr. Bruce's July 2010 mental assessment of Plaintiff and noted:

> I do not give his opinion substantial weight, as he is not the claimant's treating psychologist/psychiatrist. Further, his assessment is not supported by his own treatment records. I note that Dr. Bruce's nurse practitioner reported on December 13, 2010 her anxiety and depression was not present (47F/5). In fact, there are no reports on her mental state during her visits other than the December 13, 2010 treatment, as she has been treating her only for her physical complaints (30F, 42F, 47F).

Tr. 886.

The ALJ gave "significant weight to the opinions of Dr. Moody[10] and Dr. Khan that the claimant has the ability to follow simple instructions . . . . [and] also [gave] weight to the opinion that the claimant has a fair ability to interact with supervisors and others . . . in that I find she would be capable of occasional interaction with the public, interact with co-workers and supervisors appropriately in a stable routine setting." *Id.* (citing exs. 19F, 31F, 50F).

### c. ALJ's Consideration of Non-Examining Physicians' Opinions

The ALJ acknowledged the hearing testimony of medical expert Dr. Jonas who testified that Plaintiff has some functional limitations, Plaintiff's impairments do not meet a listing, Dr. Khan's and Dr. Hossain's diagnoses and opinions regarding extreme limitations are unsupported, and there is no support for a diagnosis of bipolar disorder based on the record evidence. Tr. 887. The ALJ agreed with the opinion of state agency consultant Dr. Estock[11] that Plaintiff had

---

[10] Robin L. Moody, Ph.D. of Upstate Testing & Evaluation Center conducted a Mental Status Exam of Plaintiff on August 23, 2011. Tr. 1325-27.  Dr. Moody's Clinical Functional Assessment of Plaintiff was as follows: "[Plaintiff] can complete chores and prepare meals. She can drive a car but often becomes nervous. She has stable relationships with her family, husband and friend. She has one close girlfriend. She leaves the house about twice a week, once to attend church and to also visit her parents. Her concentration is mildly distracted. Her pace and persistence are adequate. She can carry out simple instructions. It is in her best interest to have assistance managing her fund[s] since in the past she had excessive spending during a manic phase. She did not appear to be exaggerating any symptoms." Tr. 1327.
[11] On August 25, 2011, Robert Estock, M.D. completed a Psychiatric Review Technique form assessing Plaintiff's mental impairments. Tr. 1330-42. He analyzed Plaintiff's impairments under Listing 12.04 Affective Disorders and Listing 12.09 Substance Addiction Disorders. Tr. 1333, 1338. Under the "B" criteria of those Listings he opined that Plaintiff had moderate limitations in restriction of ADLs; difficulties in maintaining social functioning; and difficulties in maintaining

moderate degrees of limitation in the areas of activities of daily living ("ADLs"); social functioning; and maintaining concentration, persistence, or pace. *Id.*

The ALJ concluded his analysis of the medical evidence by stating:

> Dr. Bruce and Dr. Khan report all functions as "poor" yet claimant is still capable of independent finances and then he does not want to see her for months. This is inconsistent with the ratings they have stated as explained by the medical expert and are not supported by the longitudinal record.

*Id.*

### d. Analysis of ALJ's Determination

In reviewing the ALJ's consideration of the opinions of Plaintiff's physicians, the court is focused on whether the ALJ's determination is supported by substantial evidence. The court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. Here, in making his findings regarding Plaintiff's RFC, in addition to discussing Plaintiff's hearing testimony and the medical expert's testimony, the ALJ considered the opinions of various medical sources including Plaintiff's treating physicians. Tr. 884-87. As the court has explained before: "The ALJ was entitled to credit one set of evidence over another. Simply because the plaintiff can produce conflicting evidence which might have resulted in a contrary interpretation is of no moment. As recited the ALJ had substantial evidence to conclude as he did and the Court will not disturb his decision." *Washington v. Astrue*, 659 F. Supp. 2d 738, 753 (D.S.C. 2009) (internal citation omitted). The ALJ articulated sufficient reasons for assigning less weight to certain opinions of Dr. Khan, Dr. Hossain, and Dr. Bruce. Furthermore, even if the evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings.

---

concentration, persistence, or pace. Tr. 1340. He noted that Plaintiff had no episodes of decompensation. *Id.* Dr. Estock found that the evidence did not establish the presence of the "C" criteria of the Listings. Tr. 1341.

Rather, when "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the . . . ALJ[]." *Craig*, 76 F.3d at 590 (internal quotation omitted).

Given the nature and limits of the court's review, and given the well-considered rationale of the ALJ, the court should not second-guess his decision. To the extent that the opinions conflicted, the duty to resolve the conflict rests with the ALJ, not with this court. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). The court cannot now reweigh the evidence and substitute its judgment for the ALJ's. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). However, as noted above, Plaintiff has presented additional opinion evidence from Dr. Khan that has not been considered and may conflict with other record evidence credited by the ALJ. *See* Meyer, 662 F.3d 707. Accordingly, on remand the fact finder should "weigh this new evidence and reconcile it with the competing evidence in the record." *Pendarvis v. Colvin*, No. CIV.A. 0:13-487-RMG, 2014 WL 2979776, at *6 (D.S.C. June 30, 2014).

3. Listings Analysis

Plaintiff next argues that the ALJ erred in failing to conclude her bipolar disorder, depression, and anxiety met the requirements of Listings 12.04 and 12.06. Pl.'s Br. 14-16. The Commissioner contends that "Plaintiff does not explain how she satisfies the precise requirements for either listing, despite her affirmative burden of proof at step three" and therefore her claim lacks merit. Def.'s Br. 16.

The listings for mental disorders are arranged in nine diagnostic categories: Organic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); intellectual disability (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders

(12.09); and autistic disorder and other pervasive developmental disorders (12.10). 20 C.F.R. 404, subpt. P, app. 1, § 12.00.

### a. Listing 12.04

Plaintiff asserts "the ALJ failed to even mention the Claimant's bipolar disorder as an impairment to be considered at step two despite substantial evidence in the record documenting a history of bipolar disorder . . . [and] committed reversible error by failing to discuss whether the Claimant's serious bipolar disorder satisfied the requirements of Listing 12. 04. Pl.'s Br. 14. The Commissioner notes that the ALJ "expressly stated in the step-two analysis that medical expert testimony found no medical support for Plaintiff's bipolar disorder diagnosis (Tr. 882)." Def.'s Br. 16-17, n.2.

"At Step 2 [in the sequential evaluation process], the ALJ has the responsibility to determine which impairments a plaintiff has and whether the impairments are severe or non-severe." *Capers v. Colvin*, No. CIV.A. 8:13-1046-RMG, 2014 WL 2614988, at *12 (D.S.C. June 10, 2014) (internal citation omitted). Social Security Ruling 96-4p discusses the policy interpretation regarding medically determinable physical and mental impairments. Pursuant to the ruling:

> An "impairment" must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. No symptom or combination of symptoms by itself can constitute a medically determinable impairment.

SSR 96-4p, 1996 WL 374187, at *1-2. An ALJ may also ask for and consider opinions from medical experts on the nature and severity of a claimant's impairments and whether the impairments equal the requirements of a Listing. 20 C.F.R. § 404.1527(e)(2)(iii).

Here, the ALJ determined that Plaintiff had the following "severe combination of impairments: old left ankle injury with residuals, anxiety, depression, and history of alcohol abuse." Tr. 881. The ALJ noted that based on the testimony of the medical expert there was "no medical support for claimant's alleged bipolar disorder." Tr. 882. Accordingly, the ALJ did not note bipolar disorder as one of Plaintiff's mental impairments.

Both bipolar disorder and depression fall under the category of affective disorders. The ALJ did consider Plaintiff's depression to be a severe impairment, but found Plaintiff had no mental impairments that met the requirements of Listing 12.04. Tr. 881-82. The criteria for Listing 12.04 are as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for Listing 12.04 is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
>      a. Anhedonia or pervasive loss of interest in almost all activities; or
>      b. Appetite disturbance with change in weight; or
>      c. Sleep disturbance; or
>      d. Psychomotor agitation or retardation; or
>      e. Decreased energy; or
>      f. Feelings of guilt or worthlessness; or
>      g. Difficulty concentrating or thinking; or
>      h. Thoughts of suicide; or
>      i. Hallucinations, delusions, or paranoid thinking; or
> 2. Manic syndrome characterized by at least three of the following:
>      a. Hyperactivity; or
>      b. Pressure of speech; or
>      c. Flight of ideas; or

       d. Inflated self-esteem; or
       e. Decreased need for sleep; or
       f. Easy distractibility; or
       g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
       h. Hallucinations, delusions or paranoid thinking; or
3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. 404, subpt. P, app. 1, § 12.14.

       The ALJ analyzed Plaintiff's ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation under the paragraph B requirements and determined because Plaintiff's mental impairments "did not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria were not satisfied." Tr. 883. The ALJ also considered the paragraph C criteria and found the following:

There is no evidence of repeated episodes of decompensation, each of extended duration. There is no evidence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or current history or one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. In fact, the claimant reports she can go out along (40E).

*Id.*

To the extent the ALJ might have erred in finding that Plaintiff did not have a medically determinable impairment of bipolar disorder, such error is harmless because Plaintiff has not shown that she would meet the criteria for Listing 12.04. Remand would be appropriate only if the ALJ would reach a different conclusion on remand. *Dover v. Astrue,* No. 1:11-cv-120, 2012 WL 1416410, at *5 (W.D.N.C. Mar. 19, 2012) (finding that "even assuming that the ALJ did err, such error by the ALJ was harmless because remand would not lead to a different result.").

b. Listing 12.06

Plaintiff argues the ALJ failed to analyze her anxiety impairment under Listing 12.06. Pl.'s Br. 15. The Commissioner argues that because the criteria for Listing 12.04 and 12.06 are identical, there was no need for the ALJ to repeat his analysis. Def.'s Br. 18-20. The criteria for Listing 12.06 are as follows:

12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
      a. Motor tension; or
      b. Autonomic hyperactivity; or
      c. Apprehensive expectation; or

d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. 404, subpt. P, app. 1, § 12.06.

In order to determine whether Plaintiff's anxiety met or medically equaled the severity of a listing for mental disorder, the ALJ should have assessed the impairment according to the criteria set forth for that particular listing—Listing 12.06. While the Paragraph B requirements for Listing 12.04 and 12.06 are the same, Paragraph C of Listing 12.06 is different as it requires satisfaction of Paragraph A criteria of medically documented findings and "[r]esulting in complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06. In his discussion of Paragraph C the ALJ specifically noted that Plaintiff "reports she can go out alone." Tr. 883. Accordingly, Plaintiff would not meet Paragraph C of either Listing 12.04 or 12.06. The undersigned finds that the ALJ's failure to cite to Listing 12.06 was harmless error. *See Stevenson v. Astrue*, C/A No. 8:10-cv-01565-DCN,

2011 WL 4501914, *4 (D.S.C. Sept. 28, 2011) (determining the ALJ's error in citing to Paragraph C in Listing 12.04 instead of Listing 12.06 was harmless error because in later steps of his analysis "the ALJ made specific findings that conclusively negate the possibility that plaintiff's PTSD meets Listing 12.06's 'paragraph C' requirement."). "The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled." SSR 96-6, 1996 WL 374180, at *3. The undersigned finds the ALJ appropriately explained his Listing determination.

4.  Plaintiff's Credibility

Plaintiff next complains that the ALJ erred in how he conducted the credibility assessment because he did not apply the factors set forth in SSR 96-7p and 20 C.F.R. § 404.1529. Pl.'s Br. 16. The Commissioner responds that the "ALJ properly considered factors contemplated by the regulations for evaluating the credibility of Plaintiff's subjective complaints." Def.'s Br. 21.

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints, including pain. *See* SSR 96-7p; *see also* 20 C.F.R. § 404.1529(b); *Craig*, 76 F.3d at 591-96. The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole.  If he rejects a claimant's testimony about a claimant's pain or physical

condition, the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p; *see Mickles v. Shalala*, 29 F.3d 918, 927 (4th Cir. 1994) ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers . . . .").

Here, the ALJ specifically stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consisted with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." Tr. 884. The ALJ noted Plaintiff's hearing testimony that "she is unable to work because she cannot focus or concentrate for a period." *Id.* The ALJ also cited Plaintiff's testimony that on most mornings she wakes up with panic attacks that sometimes last all day, she is unable to deal with stress or changes in routine, she "cries all the time[,]" she sleeps 12 to 14 hours a day, she does not make decisions, without her medication she would become reckless, and she "spends her days on the couch watching television 70 to 75 percent of her time." *Id.* The ALJ noted that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms; however,

the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent" with his RFC assessment. *Id.*

Plaintiff cites as an example of the ALJ's "erroneous factual assumptions" the ALJ's discussion of Plaintiff's testimony regarding the extent of her duties when working for Mr. Hall. Pl.'s Br. 18. In his decision the ALJ noted that Plaintiff "testified that she was paid about $1000/month for just riding around with a friend of her father's" and this statement was contradicted by Mr. Hall who indicated she did more than just ride around with him. Tr. 887. The ALJ found this testimony was "just not very credible." *Id.* Plaintiff asserts that the ALJ mischaracterized her actual testimony because she testified that she assisted Mr. Hall in the same manner Mr. Hall described in his statement. Pl.'s Br. 18. The undersigned agrees with Plaintiff that the ALJ's reference to her testimony about her work with Mr. Hall was incomplete. However, that testimony was not the only conflicting statement the ALJ discussed in addressing Plaintiff's credibility. The ALJ noted that in August 2010 Plaintiff told Dr. Khan that she was not involved in anything productive and felt she was not contributing. Tr. 886 (citing Exhibit 41F). Dr. Khan advised Plaintiff to "occupy herself with some hobbies and engage in some structured work on a voluntary basis." *Id.* The ALJ found that "[g]iven the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet as noted, he did not give her any restrictions but encouraged her to go out and get involved with a hobby or do volunteer work." Tr. 886. The ALJ also noted reports from February 2011 that Plaintiff's "panic attacks and anxiety is better and seems to be 'manageable' (49F/7)." *Id.* In December 2011 Plaintiff reported that adjustments made to her regimen made her "moods better and more stable." *Id.*  The ALJ noted that in June 2012 Plaintiff felt that her medication was helping her feel somewhat more

energetic and motivated in the mornings, and that same month she took a trip to Myrtle Beach. Tr. 886-87. The ALJ cited to Plaintiff's statements that she visited with friends and family, she sometimes goes shopping with her husband, she is able to go out alone, and her moods remain stable and had been improving. Tr. 887. The ALJ noted that in the prior decision Plaintiff stated she went to Florida and on a three-day cruise to the Bahamas. *Id.*

The undersigned finds the ALJ's credibility analysis is supported by substantial evidence and was sufficiently specific. The ALJ adequately considered record evidence and explained his findings in discounting Plaintiff's credibility. Based on the ALJ's review of the record as a whole, including his articulated reasons for discounting Plaintiff's claims, the court finds that substantial evidence supports the ALJ's credibility assessment. *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (noting ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole).

Plaintiff also argues the "Appeals Council['s] one sentence response to Claimant's exception to this determination by the ALJ is likewise not supported by substantial evidence and fails the requirements for a proper credibility evaluation pursuant to SSR 96-7p and 20 C.F.R. §§ 404.1529." Pl.'s Br. 19. The Appeals Council considered all of Plaintiff's exceptions to the ALJ's decision contained in her counsel's November 9, 2012 objections. Tr. 838. Regarding the issue of Plaintiff's credibility the Appeals Council stated the following: "In finding your testimony less than fully credible, the ALJ provided specific rationale discussing many credibility factors, citing to the medical evidence of record, your reported activities of daily living, and the objective medical findings in the record. This evaluation of your credibility complies with Social Security Ruling 96-7p." Tr. 839 (citation to ALJ decision omitted).

As explained by the Fourth Circuit:

> The Appeals Council's denial of a request for review differs sharply from an ALJ's decision. Social Security regulations do explicitly require the ALJ to issue decisions supported by "findings of fact and the reasons for the decision." [20 C.F.R.] § 404.953(a). In contrast, the regulations do not require the Appeals Council to articulate its rationale for denying a request for review. Only if the Appeals Council grants a request for review and issues its own decision on the merits is the Appeals Council required to make findings of fact and explain its reasoning. *See id.* §§ 404.979, 404.1527(f)(3).

*Meyer*, 662 F.3d at 705-06. Here, the Appeals Council did what it was required to do. Accordingly, this allegation of error is without merit.

### 5.  Consideration of the Lay Witness's Testimony

Plaintiff argues that "the ALJ did not mention any of Mr. Creekmore's specific supporting testimony in the decision." Pl.'s Br. 19. Plaintiff also asserts the ALJ failed to "articulate the weight afforded to the testimony of Claimant's husband." *Id.* at 22. The Commissioner contends the ALJ considered the testimony of Plaintiff's husband and "an ALJ is permitted to use evidence from nonmedical sources at his discretion." Def.'s Br. 24. The Commissioner further asserts that "further evaluation of the testimony of Plaintiff's husband was unnecessary because it was cumulative and duplicative of Plaintiff's own statements concerning her limitations, which the ALJ found not entirely credible." *Id.* In reply Plaintiff argues that her husband's testimony regarding her mental impairments and limitations was not duplicative and in many respects was the "most relevant and credible testimony regarding Claimant's impairments." Pl.'s Reply 10.

"[A]n ALJ 'may' use evidence from other non-medical sources, such as testimony from spouses, parents, and friends, to show the severity of [an individual's] impairment(s) and how it affects their ability to work." *Sturm v. Colvin*, No. 6:13-1097-MGL, 2014 WL 3809495, at *18 (D.S.C. July 30, 2014) (citing 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4)). "Although 'information from [non-medical sources] . . . may provide insight into the severity of the

impairment(s) and how it affects the individual's ability to function,' these non-medical sources should be considered in light of 'the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.'" *Id.* (citing SSR 06-03p, 2006 WL 2329939, at *5–6). "Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the lay witness's testimony." *Plowden v. Colvin*, No. 1:12-CV-2588-DCN, 2014 WL 37217, at *18 (D.S.C. Jan. 6, 2014) (citing *Lorenzen v. Chater,* 71 F.3d 316, 319 (8th Cir. 1995); *Carlson v. Shalala,* 999 F.2d 180 (7th Cir. 1993); *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992); *Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984)).

As recounted in an earlier section of this Report describing testimony from the administrative hearing, Plaintiff's husband testified regarding Plaintiff's ADLs and social functioning. Tr. 957, 963-65. He also testified that Plaintiff has some memory problems so he helps with her medication, Plaintiff often has crying spells, and he makes all the household decisions. Tr. 958-59. At step two of the sequential evaluation, in discussing Plaintiff's ADLs and social functioning the ALJ cited to statements made by Plaintiff's husband in a May 2011 Function Report-Adult-Third Party. Tr. 882. In discussing Plaintiff's limitations with regard to concentration, persistence, or pace the ALJ noted that Plaintiff's "husband fills her medication box as a reminder to take her meds." Tr. 883. Although the ALJ did not refer to Plaintiff's husband's testimony in his RFC analysis, his testimony mirrors the testimony of Plaintiff that the ALJ did cite—namely that she has panic attacks, she is unable to handle stress, she "cries all the

time[,]" her husband makes all the decisions, and she spends her days watching television. Tr. 884.

"The essential purpose of requiring ALJ's to address the testimony of each lay witness is to ensure a thorough consideration of the effects of Plaintiff's impairments on her ability to work." *Lee v. Astrue*, No. CA 1:10-2837-MBS-SVH, 2011 WL 7561514, at *13 (D.S.C. Dec. 21, 2011) *report and recommendation adopted*, No. CA 1:10-2837, 2012 WL 931974 (D.S.C. Mar. 16, 2012). The undersigned agrees with the Commissioner that further evaluation of the testimony of Plaintiff's husband is not necessary because it is duplicative of Plaintiff's own statements concerning her impairments. *Lee v. Astrue*, 2011 WL 7561514, at *13 (finding that because the ALJ discussed the impairments and symptoms attested to by claimant and her husband, any error from not specifically analyzing husband's credibility was harmless).

### 6.   Consideration of the VE's Testimony

In Plaintiff's last allegation of error made by the ALJ Plaintiff asserts the ALJ erred in finding that despite her limitations there are jobs existing in the economy that she could perform. Pl.'s Br. 22-23. The Commissioner contends that the ALJ was not bound by an opinion of the VE that was based on an unsupported hypothetical. Def.'s Br. 26.

Once the claimant reaches step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform.  *Walls v. Barnhart*, 296 F.3d at 290.  "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). "In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions

which fairly set out all of claimant's impairments." *Id.* (citations omitted). The hypothetical need only reflect those impairments supported by the record. *See Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)); *see also Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999).

At the administrative hearing, the ALJ proposed a hypothetical individual of Plaintiff's age, education and work history, who had no exertional limitations, with some postural and environmental limitations. Tr. 969. The hypothetical individual additionally had some mental limitations but "could concentrate, persist and work at pace to do simple, routine, repetitive tasks at one and two-step instructions for extended periods, say two-hour periods in an eight-hour day." *Id.* The individual could also interact frequently with the public and interact appropriately with co-workers and supervisors. Tr. 969-70. The VE testified that such an individual would be unable to perform Plaintiff's PRW, but there were a significant number of jobs available in the categories of assembler/fabricator and packer/packager. Tr. 970-71. The ALJ then modified the hypothetical to add some exertional limitations and limited the individual to only occasional interaction with the public. Tr. 971-72. The VE assured the ALJ that the hypothetical claimant could perform the same jobs. Tr. 972. For his last hypothetical, the ALJ substituted an individual who could not "concentrate, persist and work at a pace for two-hour periods to do simple, routine, repetitive tasks in an eight-hour day . . . ." *Id.* The ALJ based this last hypothetical on the 2008 and 2009 opinion statements of Dr. Khan found at Exhibit 31F. The VE responded that there would be no work for such an individual. *Id.*

Plaintiff complains that, if the ALJ had properly considered the VE's response to the hypothetical based on Dr. Khan's opinion, there would be no work that Plaintiff could perform. Pl.'s Br. 23. Because the ALJ failed to adopt the more severe limitations of Dr. Khan, Tr. 885, he was not required to include them in his hypothetical. A hypothetical need only include impairments that are supported by the record and which the ALJ accepts as valid. *Russell*, 58 F. App'x at 30. Accordingly, this allegation of error should be dismissed.

III. Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.


July 23, 2015                                          Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**